Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the court is now sitting. God save the United States and this Honorable Court. Good morning everybody, please be seated. All right, we have two cases to be heard this morning and the first case is the Federal Express Corporation. Mr. Knox, whenever you are ready. May it please the Court, my name is David Knox. I am here representing the appellant in this matter, the Federal Express Corporation Long Term Disability Plan and I have reserved five minutes for rebuttal. The district court's decision in this case must be reversed because it incorrectly applied the de novo standard of review to Mr. Bilheimer's claim for benefits. The decision is based on both factual and legal errors and cannot stand. The district court committed a fundamental reversible error when it ruled that Aetna did not have discretionary authority to decide appeals under the FedEx LTD plan. Because the LTD plan propped delegated authority to Aetna, Aetna's decision should have been subject to the deferential abuse of discretion standard of review rather than the de novo standard of review. Having improperly determined that Aetna did not have the appropriate authority, the district court compounded its error by analyzing Bilheimer's claim under that de novo review. Both of these decisions are incorrect and the decision should be reversed. There is a critical issue that is really central to this case which, in my opinion, the district court completely overlooked in its opinion. And that is the LTD plan administrator's absolute authority to interpret the terms and language of the LTD plan. This authority is granted in section 6.1 of the plan and it gives the administrator, and I quote here, the absolute right and power to construe and amend the plan and administer it for the best interests of the employees. The provision also goes on to include the power, and again I'm quoting, to construe any ambiguity, interpret any provision of the plan, supply any omissions, reconcile any inconsistencies in such a manner as it deems proper. Mr. Long, Mr. Knox, are you arguing that that discretion is unlimited and unbridled, can't be reviewed, no matter how far out in the left field or right field the administrator goes? No, Your Honor, there would certainly be reasonable limits to that. The question here though is what authority does the plan administrator have to modify or to amend the plan or to exercise that authority within the constraints of the plan? There would certainly be reasonable limits. That's the problem, right, because Mr. Hicks argues that the administrator had the authority in this instance to modify the manner in which appeals were to be heard, but it had to comply with the terms of the plan, and it did not. Well, that is what he is arguing, but he's incorrect in that. I believe that the plan did comply with the requirements of the plan and also with the requirements of the law. If we speak, it's really, there's two aspects of it. Well, to modify it had to be in writing. Where is it in writing? It is in writing in the notes of the Retirement Plan Investment Board, the RPIB. It is indicated there that there was going to be a change in the way the appeals were handled. They were no longer going to be handled by the Internal Benefits Review Committee, the BRC, which there's really no dispute that the BRC was the active appeals committee and had the authority to decide the appeals. That's not disputed here. But are the minutes that, I guess that's what you're relying on, are those minutes sufficient enough to constitute an amendment to the plan? I believe they are, Your Honor. They state specifically when you look in conjunction with the memo that they reviewed, the proposal that was made to them, all of which is set out in the documents related to that, and then in the final notes, the minutes of the RPIB, where they said, yes, we're going to adopt this proposal and we're going to, they used the term, outsource this appeal process from the BRC to Aetna, and in conjunction with that, we're going to dissolve the BRC. I mean, I think it clearly shows that the intent here was to take the function that was being performed by the BRC, which no one disputes was serving as the appeal committee. You have to imply that, though. It doesn't specifically say the plan's being modified or amended. You have to, it's a modification by implication is what you're arguing it sounds like. If we're only looking at the RPIB minutes, that would be correct, and I think that would be the reasonable interpretation of that as well. I think that would be sufficient. But when you take that in conjunction with the amended administrative services agreement entered into between Federal Express Corporation, the defined LTD plan administrator, who has, again, the powers that we were just discussing a moment ago, and Aetna, to complete this transaction that was authorized by the RPIB. Don't we need to look at the four corners of the plan document and not any documents extraneous to it? No, Your Honor, not in this case, because what we are dealing with is not whether or not specific powers or specific benefits are being defined by the plan. What we are looking at is whether there was a grant of authority, a grant of discretionary authority, and the case law holds that can look beyond plan documents. If you're also talking about amendments to a plan, the case law clearly holds that extraneous documents can amend and modify an LTD plan. I guess the problem with that argument is that it puts individuals like Ms. Dillheimer at a bit of a deficit, because shouldn't they be able to rely on the terms of the plan and not have to go searching for documents outside of the plan to be able to understand what their rights are under that plan? Well, in this case, Your Honor, Mr. Dillheimer and other participants can still rely on the terms of the plan, because this outsourcing of the process from the BRC to Aetna did not change the status quo. In fact, it maintained the status quo. Wouldn't you be in a better position, though, if all they did was outsource it to Aetna? Wouldn't you be in a better position if the documents had referred it to an appeals committee in Aetna Insurance, as opposed to the company as a whole? I think certainly it could have been written more clearly. Twenty-twenty hindsight or Monday morning quarterbacking, as we often say on these types of decisions, could it have been done more clearly? Yes. But the question is – In fact, it has been done more clearly, right? Yes, Your Honor. There has been a subsequent plan amendment, which Amicus Council referred to in his brief, to try to clarify this issue in case there were any questions about it. But the question is not could it have been done better. The question is, was what was done sufficient? And in this particular case, it certainly was. The case law that Amicus Council has cited on this particular issue, I guess primarily the Cozy case, what we're really dealing with there is a situation, and also the Supreme Court case in Amara, what we're really dealing with in situations is the plan provided a level of benefit at X. And some extraneous document in Amara, it was the summary plan description, described those benefits at an can change the level of benefits being awarded by the plan document. The court said there, no, we don't look to those, we look to the plan document. But as the court, the district court in South Carolina in the – pardon me, I'm drawing a blank – in the Turner case, I'm sorry, I've cited it in our brief, noted administrative services agreements are frequently looked to by the courts to determine whether or not discretionary authority has been granted. Let me read you a sentence from the district court's opinion on this issue. He says, Section 5.3 of the plan instrument best Federal express with the right to appoint an appeal committee, not the right to outsource the entire process to a third party. And this relates to Judge Floyd's question. That seems inherently logical to me, that there was a process in place, and your client did not comply with that process. You know, outsources as the court has defined it, and as Mr. Hicks has defined it, is an entirely different process than appointing someone. Well, Your Honor, I don't believe that it is. And I believe, as I explained in my brief, you know, to appoint someone, using the terms – I mean, his counsel includes his brief – merely means to select or designate some person or some entity to perform a function. Outsourcing is exactly the same thing. It is selecting an external entity to perform a function that was previously performed by an internal entity. It is selecting – Selecting an external entity to then appoint someone or something to actually do the work of an appeals committee, is that problematic? No, Your Honor. Again, there's two aspects of this. First is whether outsourcing and appointing can be interpreted as meaning the same thing. And I believe that they can. They both deal with the process of designating or selecting. That's exactly what happened here. So the question then really becomes, can Aetna as an entity be designated as the appeal committee? And there's nothing to indicate that it cannot. In fact, the district court opinion also stated that there would not have been any problem whatsoever – that's not quoting, I'm paraphrasing, obviously – there would not have been any issue with this if the plan had designated or outsourced the claims process to a specific Aetna entity. It doesn't say to a committee, it doesn't say to a group of individuals that will be designated at deciding these appeals, it says to an Aetna entity. It doesn't make any logical sense to say that it could be designated to an Aetna entity, but it can't be designated to Aetna as an entity. All right. Mr. Knox, let me ask you to turn to the second part of this case. Let's assume that we agree that – or even if we don't, I suppose that the standard of review will differ depending on the resolution of the first issue – but I read the record with respect to the decision made on Mr. Bilheimer's claim, and other than just parodying the various opinions of treating physicians and others in big block, single block paragraph, where is the reasoning that one would expect explaining why the claim was denied in this case? I just had trouble understanding exactly why the claim was denied other than the fact that they parodied all this medical language but didn't tie it into the denial of the claim. Can you explain that to me? The claim was denied, Your Honor, because the evidence in the record indicated that Mr. Bilheimer could perform sedentary work. You can look no further than the award by the Social Security Administration to find that. But over and over, nobody is disputing and nobody is questioning whether Mr. Bilheimer is suffering from these physical conditions. That's not an issue in this case. He suffers from these physical conditions. The peer review reports that are in there contain no questioning or no disparagement of the opinions of the treating physicians in terms of the actual conditions that Mr. Bilheimer suffers from. That's not an issue. The only issue is whether or not these conditions prohibit him from performing any substantial employment, engaging in any compensable employment. Substantial is not included in the terms of the plan. This is a very strict definition in this plan. And in reviewing some of the cases again last night, I noted that there are other cases which have this strict level of definition, definition of total disability. In order to be totally disabled, you cannot be able to perform any compensable employment for a minimum of 25 hours a week. The district court relied primarily on, I don't know exactly how to pronounce his name, but Dr. Rogo's opinion that Mr. Bilheimer cannot work. And again, it's not a question of what disabilities he had. It's a question of whether or not he could work. Dr. Rogo said he cannot. Dr. Morris, who performed this thorough evaluation for the Social Security benefits determination, said yes, he has some limitations. He has some sitting and some standing and some lifting restrictions. But those restrictions read types of restrictions are frequently accommodated under the law by employers. And employers are required to engage in an interactive process with somebody with those types of conditions to see whether or not a job can be modified so that they can continue to work. And you read those restrictions as being cumulative, that is, that it's not one or the other. He could sit and stand for a sufficient number of hours to exceed 25. Yes, Your Honor. In reading the restrictions, there's nothing to indicate in Dr. Morris's review of the restrictions that they are cumulative or that they somehow prevent him from engaging employment. And in fact, the Social Security Administration agreed with that in reviewing, taking Dr. Morris's opinion in reviewing all this. They said yes, he can perform the full range of sedentary work. Now, Meeks Council argues, well, that's the absolute lowest standard out there. Yes, it is. No dispute there. But it means he can That, coupled with the opinions of all of the peer review physicians, who, again, don't question or doubt the fact that he had these disabilities, but say these conditions are not so severe that he cannot perform any level of employment. Now, what the District Court did here, the primary mistake the District Court made was they imposed a vocational requirement on this. They said it has to be a certain level of income. And as this Court has said in Pipe and Hagen and the subsequent cases cited in my brief in the Fourth Circuit, that type of vocational requirement is not required. And the plan in this case does not require it. I see my time is out. If I may add one last point to this. All that is required is that he is able to do something. We have Costco's in Memphis, and I know that they're all around the country. There's an individual that sits at the door at Costco that basically looks to see, do you have a Costco card? And if you do, they let you in. Under the FedEx LTD plan, if Mr. Bilheimer can do that, then he is not totally disabled. And the restrictions that are set forth in the plan are not such that would prohibit him from doing even that level of employment. So under the plan, he is not totally disabled. All right. Thank you, Mr. Knox. We've got some time for rebuttal. Mr. Hicks? Good morning. George Hicks, amicus curiae, in support of Richard Bilheimer. And may it be the court correctly held that the de novo standard of review applies to the denial of Mr. Bilheimer's denial of benefits. And it correctly found under that de novo review that the evidentiary record supported a finding of total disability as defined in the plan. Now, this court's cases make very clear that the ERISA plan has to provide a clear conferral of discretion upon the entity that makes the particular decision-making authority. And as I think has been made clear in this, nowhere on the face of the plan does it actually do grant discretion to Aetna to make appeals determinations. Instead, FedEx has had to make these two backdoor arguments. Now, the fact that we're even in this land where FedEx has to resort to these two arguments, I think, confirms that the plan does not clearly grant discretion to Aetna to make these determinations. But I will address each of these two backdoor automatically has the discretion that the plan gives that appointed appeal committee. But for three reasons, this argument does not work. The first is that, as explained in our brief, Aetna simply was not appointed an appeal committee. There's nothing in the documents that suggests that it was being appointed. There's nothing that suggests that it is a committee. This Court's cases make very clear that plan language is construed against the drafter. So, you know, however you want to look at it, I don't think that there's any way that you can intuitively say that outsourcing the appeals process to Aetna is the same as appointing an appeal committee. Well, you just said that the plan language is construed against the drafter. But the plan take issue with the use of the word outsourcing in the minutes as opposed to appointing. Is it as simple as that, that they use the wrong word? Well, I think you're correct in that, Judge Diaz, in that this is about complying with the language of the plan. As you said before, that FedEx had to comply with the terms of the plan. And the plan requires appointment of an appeal committee. And however you look at it, what was done here was not appointment of an appeal committee. Now, there are two other reasons why this argument also doesn't work. The second is we have this amendment to a service agreement that FedEx counsel refers to over and over again. That actually gives clear discretion to Aetna to make these appeals determinations. But if that's the case, then it was superfluous if we're talking about this automatic discretion that came about because Aetna was appointed the appeal committee. There would have been no reason for the amendment to the service agreement at all, which clearly grants discretion, if, in fact, Aetna was appointed an appeal committee and thereby automatically gained the discretion under 5.3C. So I think that the fact that there is the amendment to the service agreement shows that this automatic discretion idea, by virtue of being appointed the appeal committee, is a post hoc argument that doesn't wash when you look at the actual documents. And the third point on this first argument by FedEx that Aetna was appointed the appeal committee, Section 6.1 of the plan gives FedEx as administrator the authority to delegate non-fiduciary duties to Aetna or any other third party. And there's been no dispute throughout this case that that does not give FedEx the authority to delegate fiduciary duties like appeals determinations. And, in fact, that's, I think, presumably why, in the district below, FedEx's lead argument, as opposed to here, was that, well, that's why the plan was amended. So they didn't actually make this sort of substitution automatic discretion argument because that runs into problems with Section 6.1 of the plan, in addition to problems with the fact of the amendment to the service agreement. So, you know, for a number of reasons, I don't think you can look at this sort of automatic discretion point by virtue of Aetna being appointed the appeals committee. Now going to their second argument, which they don't focus too much on at this point, but was their lead argument below, is the idea that, well, the plan was amended to allow for all of this. But at no point, I think, have we ever even seen what exactly was amended. I mean, the plan language is the same before. The plan language is the same after. They point to the RPIB minutes, but there's nothing in there that talks about amending. There's nothing that points out the need for amending. There's nothing that gives off any indication that there was actually an amendment of the plan. Well, let me ask you the same question that I asked the appellant. If they had appointed an Aetna appeals review committee as opposed to Aetna itself, wouldn't they be in a better position? I think they would be in perhaps a better position, but I don't think that would be enough here under the clear language of the plan, for the reasons that I stated before, which is that the 6.1 of the plan does not permit delegating any, by virtue of allowing delegation of non-fiduciary duties to Aetna and others by implication, and I don't think there's any dispute about this in this case, it does not allow delegation of fiduciary duties to any other third party absent amendment of the plan. And what I would add to that is that when you look at the plan as a whole, at the actual plan documents, everything fits into place when you have FedEx's benefits review committee doing the final appeals determination, and you've got Aetna, the claims paying administrator, doing the initial determination. It all works because Aetna is given the job in the plan of the initial claims determination. Isn't that a fiduciary responsibility as well, the initial determination? It is, but the plan gives, the plan expressly gives Aetna that fiduciary determination, so that doesn't run into the problem of trying to delegate something other than that. Now, I want to make sure I understand your argument. You're saying that notwithstanding the fact that Section 5.3 of the plan authorizes the administrator to appoint an AP committee, that that couldn't happen without a plan amendment? Is that your argument? No, what I'm saying is that FedEx can duly appoint a committee to do that, but I think it is constrained by that Section 6.1 language in terms of what it can actually appoint, and this goes to Judge Floyd's point of why appointing sort of, for example, an Aetna committee would not work, because, and to my point of why it works with the internal benefits review committee, I think when you get the plan as a whole, what it's saying is that FedEx can appoint a review committee, and that is an internal committee. So the benefits review committee that we had prior to 2008, that's the appointed appeal committee. But then to do anything more than that, so what happened in 2008 when they just said, well, we're just going to send all of our appeals work over to Aetna. Well, that's fine if they want to make that contract, but that is not in accordance with the plain language of the plan. And no one's saying that when that happens, that Aetna can't make the final appeals determination. What we're saying is that when that occurs, the review is de novo. And so the District Court was very clearly correct in deciding that this would be de novo review. Okay, so if they had shifted, if the plan administrator had shifted appeal responsibility to some other internal committee, that would have been fine without any need to amend. It's the notion that because they're using a third-party administrator, that requires both an amendment and then an appointment? I think that is correct in the sense that only then are you satisfying the plan language, because under the current plan language, you run into problems either way. And that, I think, is why FedEx has always argued throughout this case this alternative argument that, well, we did amend the plan. Because at the end of the day, I think you have to get there in order to be able to give anything to this outside entity. But then if you look at whether the plan was actually amended, again, there's simply nothing in the record that shows this. The only two things that FedEx counsel points to are the RPIB minutes, which refer to nothing regarding amending a plan, but especially the amendment to the service agreement. And the amendment to the service agreement amends the service agreement. It has nothing to do with the plan itself. This is just a contract between FedEx and Aetna that describes their responsibilities. And contrary to what Mr. Knox has said, the courts have been very clear that service agreements are, in fact, not plan documents. And certainly the Amara case and this court's COSI case really emphasize that point. And so I think it's very difficult to look at the amendment to the service agreement and say, by virtue of that, that the plan was amended. And as the district court points out, and I don't think there was any response to this in FedEx's briefing, but giving the discretion to Aetna in the amendment to the service agreement doesn't resolve the question of, well, were they able to do that in the first place, which is what the point of the plan amendment was supposed to be. It seems to me that the appellate is arguing almost that one has to be helpless in order to be entitled to benefit. That's not the case, is it? Absolutely not, Judge Floyd. And, you know, if I may then turn to the merits of the decision on the evidentiary record, the total disability definition under the LTD plan doesn't even have to do with total help and assist or anything along those lines. It says ability to engage in compensable employment for 25 hours a week. And there's ample evidence in the record that provides the significant objective findings that Mr. Billheimer was unable to do so or that one could reach that determination. Now, if we're talking about the NOVA review and looking at the district court's finding that Mr. Billheimer satisfied this total disability definition, the standard, and I don't hear FedEx to be arguing otherwise, is whether that is clearly erroneous. And the standard, as this court has said and based on the Supreme Court, is whether there's a firm and definite conviction of a mistake by the district court in reaching that. And I just don't think you can say that based on the evidentiary record here, given the ample findings by Dr. I've called him Dr. Rougeau, so we can call him one way or the other. But he provided ample evidence, three different attestations, going back, looking at all the other, his own in-person examinations, going back and looking at previous in-person examinations, MRIs, EMGs, providing the significant objective finding that Mr. Billheimer suffered from very severe back injuries, cord compression, spinal cord degeneration that were causing him these musculoskeletal and neurological problems. Well, it seems at the moment that the standard of review is abusive discretion. Can you win under that standard? Absolutely, Your Honor. For one of the reasons that Judge Diaz pointed out, which is abusive discretion is not just a rubber stamp. There has to be some connection between the facts and the conclusion that is provided. And if you look at the appeals determination by Aetna that's in the record, I mean, it's extremely hard to read. It's 65 lines, basically, of just recitation, followed by essentially one sentence saying, and therefore we find that you do not have significant objective findings to support total disability. Thank you very much. But if we can find support in the record for that ultimate finding, isn't that enough? And Mr. Knox has pointed to Dr. Morris' conclusions regarding the range of work that your client could perform. Well, several responses. First of all, I don't think it's enough because the affidavits have to – this Court's cases also say that the affidavits by the treating physician have to be taken into account. They're not given controlling weight, unlike the Social Security. Oh, no, no. Yes, this is not – there's not an automatic treating physician rule. However, the Court's cases do also make clear that you can give the treating physician who has done the in-person examinations more weight. And the second point I want to make about Dr. Morris' examination is that I guess I find it odd that it's being used against Mr. Billheimer because Dr. Morris reached the exact same findings regarding Mr. Billheimer's conditions as all the other in-person doctors talking about his severe back problems, his musculoskeletal conditions, the compression of the spinal cord. And then the only thing that FedEx really hangs its hat on is this very end finding, which, again, is at the end of a determination that resulted in complete, full Social Security disability for Mr. Billheimer, saying that in the end, he can work – he has – he can, during an eight-hour work day, be seated for four hours, standing for two hours, and so forth. And, you know, I think there are some problems with treating this as some sort of evidence that he was not totally disabled for 25 hours a week. First of all, FedEx, in their briefing, uses Dr. Morris' opinion to claim that he could do sedentary work. He could do sedentary work. Well, if you look at Dr. Morris' opinion, the sedentary work is four hours a day. So if we're going to talk about sedentary work, then I don't see how you get to 25 hours. But besides that, Dr. Morris was not called in to sort of make a determination about how many hours per week he could work. He was not presented with this question of could he work 25 hours of compensable employment. So I think to put any weight on that in terms of this total disability finding under the LTB plan would be mistaken, particularly – Somebody must have asked him to do that, or did he do that on his own? I believe that's part of just the Social Security Administration guidelines and regulations for providing that sort of – Well, and I guess the problem is that we're dealing with an entirely different standard here in the plan, which is not quite as helpful to Mr. Bilheimer as in the Social Security context. Well, it's not quite as helpful, but it's still not nothing. And at this point, I do want to take issue with a point that FedEx has been making, that the district court somehow included a vocational requirement. That's not true. The district court opinion only states that compensable employment – or that total disability, I'm sorry, does not mean being utterly helpless. And that's not a vocational requirement whatsoever. The vocational requirement is something that, you know, looks at whether, based on a person's background and age and education, a certain type of employment is appropriate. And that's not what the district court did at all. What it did, in fact, was consistent with what almost every court of appeals has said, and this court has never said otherwise when it comes to being utterly helpless. And the second point about this sort of utterly helpless point is, again, it's not really material because the LTD plan doesn't require utter helplessness to be totally disabled. All it requires is showing that you can't work 25 hours per week in compensable employment. And Dr. Rougeau's findings, and I want to point out, I think it a little remarkable that nowhere in FedEx's reply brief does it even once refer to Dr. Rougeau, the treating physician, or his affidavits, or his medical opinions. And I think that the omission is very telling because that is very clear evidence in the record that supports a finding of total disability under the plan. If the standard is abuse of discretion, don't we just simply here have a battle of experts? You've got 10 doctors on FedEx's side opining that Mr. Bilheimer can do compensable work. You've got Dr. Rougeau's opinion to the contrary. You've got Dr. Morris opining that he can do some range of sedentary work. Why wasn't the plan administrator entitled to accept the opinions of the FedEx doctors to the exclusion of the others? Well, I think that if there had been some sort of rational explanation for that, that perhaps it would be a closer case. But when you look at the Aetna decision, it does everything that this court has said constitutes an abuse of discretion, which is, for example, it looks at Dr. Rougeau's opinions, but it doesn't actually look at any of the pro-Bilheimer findings and explain, well, this is why we don't think that this works or this way. Did you say they needed to engage more with those opinions and explain why they just weren't credible? Well, I don't think that there needs to be a sort of discrete burden. We're not looking at a particular level of explanation, but I do think that, as you said before, there needs to be some connection between the factual findings and the explanation. And in addition, I think that the factual findings need to engage in some respect with Dr. Rougeau's, the treating physician's own medical opinion, his in-person examinations, and frankly, his affidavits. I mean, the courts have said, and I refer you to this court's decision also in the Donovan case, which I believe is 462 Fed 3321, which has said that the failure to look at affidavits constitutes an abuse of discretion. Now, this is all, again, talking about the abuse of discretion standard, and I think that if we're in the general world, I don't think there's any way that you can credibly find that Judge Anderson's determination that Mr. that that was a definite mistake. Thank you very much. Thank you, Mr. A couple of points, if I may, starting first off with the lower courts, including a vocational requirement here. I mean, his counsel has argued that that's not at all what the court did. I disagree with that, and I would also point to actually make his counsel's brief at pages 50 and 51, which I cited in my brief where they say that the definition of total disability under the plan must per se include, and I'm quoting here, some consideration of whether he is vocationally qualified to obtain such employment and to earn a reasonably substantial income from it, rising to the dignity of an income or livelihood. And he quotes a Second Circuit opinion for that. That's on page 19 of my reply brief is where I quote that. That is, in fact, including a vocational requirement, which this court in Pipe and Hagen has said, as a matter of law, that requirement does not exist. So just on that particular point, I did want to point out that, yeah, the district court actually did include that. The court also noted that regarding whether or not he had suffered a total disability here under the terms of the plan, I mean, his counsel is arguing that when you look at the restrictions that Dr. Morris placed on the individual as part of his review, one could reach the conclusion that the individual was unable to work. But that's not a conclusion that Dr. Morris reached, and that's not a conclusion that any of the reviewing physicians reached. That is a conclusion that Dr. Rugo reached, and that's not disputed here. But it's interesting to note that even that treating physician's records and opinions, all of which would have been considered as well by the Social Security Administration in making their determination, and the Social Security Administration following the treating physician rule and giving more weight to the opinions of a treating physician, still found that Mr. Bilheimer was capable of performing the full range of sedentary work. So even under the, I would say, the more lenient standard or the one that relies more heavily on the treating physician's opinions, the Social Security Administration still found he can engage in sedentary work. So if, I mean, we've got the treating physician saying that he is totally disabled as defined by the terms of the plan, then how can it be the case that there are, as the denial letter said, there are no significant objective findings to substantiate that conclusion? I mean, there is evidence in the record. It's just the evidence was discounted or, you know, FedEx decided that the evidence to the contrary was more persuasive. But that's a different result than simply saying there's no evidence in the record to support Bilheimer's claim that he suffers from a total disability. And that's the problem that I have with this letter is just that it doesn't engage with the evidence. Well, I understand, Your Honor, but the question here is, and again, this would assume we're going under the abuse of discretion standard. The question is whether or not there is evidence in the record to support the decision that the plan administrator made. The administrator is not necessarily required to comment on every single piece of evidence or to give commentary on what evidence is going to necessarily explain why it is relying on one, not relying on the other. The record do reflect, however. The only question here is, did they give due consideration to the doctor's opinions? And the record reflects, I believe, both in terms of the documents that were reviewed by the peer review physicians and also the documents identified in the denial letter, if I remember correctly, that the opinions of Dr. Rugo were considered and were given appropriate weight. There's nothing to indicate that the plan said, you know, we think this guy's out in left field or we don't believe anything that this guy's saying. The question is, you have one doctor saying, I think he's totally disabled. You have a large number of other doctors saying, I don't think he's totally disabled under the terms of the plan. So what if the standard is de novo? Isn't one doctor enough? One doctor may be enough under the standard, but under the de novo standard. But the question then becomes, again, a weight, the overall weight of the evidence. Does it make sense to rely strictly and solely on one doctor? You know, this is normally, this is turned the other way around where plans are accused of cherry picking and saying, well, I'm only going to pick one particular piece of evidence and base my decision entirely on that. That is exactly what is happening here. I'm, again, out of time if I may finish. Well, what about the fact that the 10 doctors that your client chose to review this file did just that? They reviewed the file, never examined Mr. Bilheimer. Wasn't the district court entitled to consider that? The district court can consider that, yes, Your Honor. But under NORD, there's no requirement that any special weight be given to the treating physicians in lieu of or as opposed to the peer review physicians. All right, thank you. Thank you, Your Honor. All right, we'll come down and greet counsel and proceed to our next case. Before I do that, I do want to thank you, Mr. Hicks, for taking on this assignment as amicus in this case. Obviously, the work of this court in large part turns on the advocacy and ability of the lawyers to come and present the case in an adversarial posture. You've done that very well in this case, and we appreciate your service on behalf of the court.
judges: Albert Diaz, Henry F. Floyd, Stephanie D. Thacker